53 F.3d 821
 Piroshka KORMOCZY, Ida Keszeg, Arpad Keszeg, Michael
Godollei, Irene Godollei, Frederick Kormoczy, and
Rosa Kormoczy, Petitioners,
v.
The SECRETARY, UNITED STATES DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT, on Behalf of Marlene BRIGGS and
Michael Briggs, Respondent.
 No. 94-2526.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 8, 1995.
Decided April 28, 1995.
 
 On Petition for Review of an Order of the Secretary of the United States Department of Housing and Urban Development No. 05-91-0747-1.
 Everett J. Cygal, Gino P. Naughton (argued), Chicago, IL, for petitioners.
 Dennis J. Dimsey, Eileen Penner (argued), Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, DC, Konrad J. Rayford, U.S. Dept. of Housing and Urban Development, Chicago, IL, Roberta Achtenberg, Harry L. Carey, Nelson Diaz, John Herold, Department of Housing and Urban Development, Office of Gen. Counsel, Washington, DC, for respondent.
 
 
 1
 Before POSNER, Chief Judge, RIPPLE, Circuit Judge, and NORGLE, District Judge.*
 
 
 2
 NORGLE, District Judge.
 
 
 3
 Petitioners seek review of a decision entered by an administrative law judge ("ALJ") holding that Petitioners had violated the Fair Housing Act. 42 U.S.C. Secs. 3601-3631 ("Act"). The ALJ conducted a two-day hearing in January 1994 on the matter and held that Petitioners declined to rent an apartment to Marlene and Michael Briggs (the "Briggs") due to their familial status. The ALJ issued an order to that effect on May 16, 1994, which became the final decision of the Secretary thirty days thereafter. 42 U.S.C. Sec. 3612(h). This petition for review was filed timely on June 27, 1994. 42 U.S.C. Sec. 3612(i)(2).
 
 I.
 
 4
 In March 1991, Petitioners placed a sign on their apartment building, located at 2065 West Jarvis in Chicago, advertising that an apartment was for rent, listing the phone number of Ida Keszeg ("Keszeg"), one of the six owners. The Briggs attempted to rent an apartment in that building. The three story building contained six flats, two on each floor, of which five were rented and one was occupied by Piroshka Kormoczy ("Kormoczy"), mother of three of the owners. Two of the apartments were vacant in March 1991.
 
 
 5
 After making an appointment, the Briggs and their daughter, age six at the time, visited the apartment. Kormoczy showed an apartment to the Briggs located directly above her own apartment. Because Kormoczy does not speak english, an interpreter assisted in communicating with the couple. The Briggs asked Kormoczy whether having a child in the building would be a problem for her. Kormoczy responded that, although she did not wish to have children living above her, she did not have the authority to make the decision. Kormoczy had no ownership interest in the building, but she often shows the vacant apartments to those who inquire about them.
 
 
 6
 The Briggs requested an application, but Kormoczy said none was available at the time. Once home, Marlene Briggs called the phone number listed on the sign and asked whether she might have an application and whether children would be a problem. The woman who answered the phone said that applications were available and that children would pose no difficulty. Later that day, Michael Briggs returned to the building for an application. Kormoczy met Michael Briggs and, through the same interpreter, stated that she did not want children living above her, but that it was not her decision as to whom the owners would rent.
 
 
 7
 The couple completed the application in two days. They returned the application to Kormoczy who then, without an interpreter, showed the couple an apartment located directly across from the one shown before--i.e., not above Kormoczy's apartment.
 
 
 8
 Approximately one week passed without a response to their application. When Marlene Briggs called regarding the status of her application, the woman who answered relayed that the application was not available. In the following weeks, Marlene Briggs made several other inquiries by telephone, but to no avail.
 
 
 9
 In April 1991, Marlene Briggs received a telephone call from co-owner Keszeg who explained that they denied their application because elderly people lived in the building and the owners did not want children living there. In addition, on September 6, 1991, Keszeg admitted to HUD Investigator John Meade that Kormoczy had told the Briggs that she did not want children living above her. At the hearings, however, Keszeg denied making such admissions and claimed that the reason for their refusal to rent concerned the bad credit history of the Briggs.
 
 
 10
 The seven Respondents are Piroshka Kormoczy, Ida Keszeg, Arpad Keszeg, Michael Godollei, Irene Godollei, Frederick Kormoczy, and Rosa Kormoczy. Piroshka Kormoczy is the mother of Frederick Kormoczy, Ida Keszeg, and Irene Godollei. All except Piroshka Kormoczy own the apartment building in question.
 
 II.
 
 11
 The final order of an agency will stand unless it is not legally or procedurally sound, or it is not supported by substantial evidence. 5 U.S.C. Sec. 706(2). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Jancik v. Dept. of HUD, 44 F.3d 553, 555 (7th Cir.1995) (quoting Herron v. Shalala, 19 F.3d 329, 333 (7th Cir.1994)). Although the Court reviews the entire record, it may not decide the facts anew. Herron, 19 F.3d at 333. Congress allows only narrow review of agency decisions. Soules v. United States Dept. of Housing & Urban Dev., 967 F.2d 817, 821 (2d Cir.1992). "[A]n ALJ's credibility determinations are entitled to considerable deference and will be overturned by a reviewing court only when extraordinary circumstances so require." Carry Companies of Ill., Inc. v. NLRB, 30 F.3d 922, 926 (7th Cir.1994); Jancik, 44 F.3d at 556 ("We accord considerable deference to the credibility determinations of the ALJ.").
 
 
 12
 In addition, the court is mindful that "[o]nce a trial has been conducted, this Court will not decide whether a plaintiff has met her burden of making a prima facie case, or whether a defendant has met the alternative burden of producing evidence of a legitimate rationale for discharge." Castleman v. Acme Boot Co., 959 F.2d 1417, 1421 (7th Cir.1994) (reviewing an age discrimination jury trial held in the district court). "[T]he McDonnell Douglas burden shifting framework falls away once there has been a jury trial and verdict." Watson v. Amedco Steel, Inc., 29 F.3d 274, 279 (7th Cir.1994). In an age discrimination case, this Court ruled that "[o]nce the case has been tried, however, the rules about the prima facie case, defendant's response and methods of proof no longer are relevant." Grohs v. Gold Bond Bldg. Products, 859 F.2d 1283, 1286 (7th Cir.1988); Pignato v. American Trans Air, Inc., 14 F.3d 342, 347 (7th Cir.1994) ("[D]espite certain apparent weaknesses revealed by the record in [Plaintiff's] prima facie case we leave without further comment the district court's finding that he had established it.").
 
 
 13
 The provision at issue is 42 U.S.C. Sec. 3604(a) which proscribes the refusal to "rent after the making of a bona fide offer ... a dwelling to any person because of ... familial status...." Petitioners initially question whether the ALJ erred in holding that the Secretary satisfied his burden to prove that Petitioners had violated the Act.
 
 
 14
 The elements of familial discrimination follow closely the elements of employment discrimination. As such, the Secretary has the burden to establish its case of familial discrimination in one of two ways. The Secretary may establish that a defendant had a discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the McDonnell Douglas test. These two methods are distinct evidentiary paths. Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 569 (7th Cir.1989) (addressing a 42 U.S.C. Sec. 1981 claim).
 
 
 15
 Using the direct method to establish intentional discrimination, commonly referred to as disparate treatment, a plaintiff may introduce direct evidence or circumstantial evidence. Troupe v. May Dept. Stores Co., 20 F.3d 734, 736 (7th Cir.1994) (addressing employment discrimination due to pregnancy). Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent. Id. "[C]ircumstantial evidence is admissible too, to provide a basis for drawing an inference of intentional discrimination." Id. (outlining three categories for circumstantial evidence of intentional discrimination). Where direct evidence is used to show that a housing decision was made in violation of the statute, the burden shifting analysis is inapposite. See id. at 568-69. Instead, once the plaintiff demonstrates disparate treatment through the direct method, a defendant must prove by a preponderance of the evidence that it would have made the same decision absent the impermissible factor. Id.
 
 
 16
 In the case sub judice, the ALJ employed the direct method of proof. Thus, as mentioned above, the McDonnell Douglas burden shifting analysis is not applicable. Therefore, we examine the record narrowly and question whether the record supports the finding that Petitioners rejected the Briggs's rental application because of their child.
 
 
 17
 The Court finds that the ALJ's decision is legally and procedurally sound, and is supported by substantial evidence. Accordingly, the final order stands.
 
 
 18
 The ALJ heard two days of testimony and made determinations, both of fact and of credibility. His thorough report together with the record disclose that the finding is supported by substantial evidence. Despite the inconsistencies which Petitioners enunciate, we find that the ALJ did not err in his factual and credibility determinations. The ALJ found that the two critical statements were made: (1) that Kormoczy stated she preferred not to have children living above her, and (2) that Keszeg stated that the owners did not want children to live in the building. Although Kormoczy denies having made any such statement, her recollection of the encounter was poor. In addition, Investigator Meade testified Keszeg admitted her mother, Kormoczy, expressed her disapproval of children in the building. Even though Keszeg denies having made the admission, the ALJ found that Meade was a more credible witness than Keszeg in light of all of the evidence.
 
 
 19
 As to the Petitioners' credibility generally, the ALJ found that their version of the events was inconsistent. As to the Briggs' credibility, the ALJ recognized that Michael Briggs' 1990 federal tax return listed two dependents when he only had one child, that Marlene Briggs used the name "Briggs" before she was married, and that the HUD complaints did not completely outline each incident to which they testified. However, as the ALJ held and with which we agree, those inconsistencies did not impair the believability of their testimony as to events relating to the apartment. In fact, the ALJ found Michael Briggs' version more credible than Petitioners' version. Specifically, the ALJ was persuaded by Michael Briggs' testimony, as corroborative evidence, recounting what his wife was told over the telephone. Marlene Briggs testified that, in the process of checking on their application, the last time she phoned the number listed on the sign, she was given a second phone number. When she called the second number, the woman explained that she did not have the application and that she would find it and advise Marlene Briggs as to any changes. The woman phoned back and explained that elderly people lived in the building and kids were not wanted in the building. (Transcript of Hearing January 25, 1994, at 256.)
 
 
 20
 Lastly, the ALJ considered Petitioners' contention that the Briggs were rejected due to a poor credit history. The ALJ found that the Briggs' credit history was not a factor in Petitioners' decision given that the Briggs' former landlord was never contacted, no written report was offered into evidence, and the individual allegedly responsible for compiling the report was deceased at the time of the hearings.
 
 
 21
 In sum, the ALJ's determinations are legally and procedurally sound, and are supported by substantial evidence. The ALJ did not accept facially incredible testimony, nor did he disregard uncontroverted sworn testimony. The ALJ considered the testimony of the witnesses and found that Petitioners rejected the Briggs' rental application because they had a child. Petitioners violated the Fair Housing Act. Accordingly, we affirm.
 
 
 
 *
 Hon. Charles R. Norgle, Sr., United States District Judge for the Northern District of Illinois, sitting by designation